NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

JON D., KRISTIE W., *Appellants,*

*v.*

DEPARTMENT OF CHILD SAFETY, C.W., *Appellees.*

No. 1 CA-JV 15-0121
FILED 10-22-2015

Appeal from the Superior Court in Mohave County
No. B8015JD201404005
The Honorable Richard Weiss, Judge

**AFFIRMED AND REMANDED WITH DIRECTIONS**

COUNSEL

Arizona Attorney General's Office, Mesa
By Eric Knobloch
*Counsel for Appellee* Department of Child Safety

Rideout Law PLLC, Lake Havasu City
By Wendy Marcus
*Counsel for Appellant* Jon D.

Law Offices of Heather C. Wellborn PC, Lake Havasu City
By Heather C. Wellborn
*Counsel for Appellant* Kristi W.

---

**MEMORANDUM DECISION**

Judge Andrew W. Gould delivered the decision of the Court, in which Presiding Judge Donn Kessler and Judge Dawn Bergin[1] joined.

---

**G O U L D**, Judge:

¶1         Jon D. ("Father") and Kristie W. ("Mother") appeal from the juvenile court's order terminating their parental rights to C.W., their minor child ("Child").  For the following reasons, we affirm but remand with directions for the juvenile court to amend its findings of fact and conclusions of law.

## FACTS AND PROCEDURAL HISTORY

¶2         Mother and Father met in California.  Shortly thereafter Mother became pregnant.  Father, however, did not believe the Child was his because he had undergone two vasectomies.[2]  Nonetheless, Mother, who was addicted to methamphetamines, asked Father if she could live in his house in Bullhead City to "get clean" before the birth of the child.  Father agreed.

¶3         On January 15, 2014, Mother went into labor; Father took her to the hospital and remained with her until Child was born.  After Child's birth, Father left Arizona and returned to his home in California.

¶4         When Child was born, Mother tested positive for methamphetamines and marijuana.  Child also tested positive for methamphetamines and was suffering from respiratory problems.  As a result, the Department of Child Safety ("DCS") took custody of Child.

¶5         Shortly after Child was born, a DCS investigator spoke to Mother and informed her that she would have to resolve her outstanding criminal cases in California to regain custody of Child.  Without informing

---

[1]     Pursuant to Article VI, Section 3 of the Arizona Constitution, the Arizona Supreme Court designated the Honorable Dawn Bergin, Judge of the Maricopa County Superior Court, to sit in this matter.

[2]     In reaching this conclusion, Father apparently disregarded the fact he had fathered a child after his first vasectomy.

DCS, Mother left Arizona and went to California to resolve her legal issues. Mother had no contact with DCS until late June 2015.

¶6 On January 26, 2014, DCS filed a dependency petition. In the petition, DCS alleged Child was dependent as to Mother because Mother was abusing substances and engaging in criminal activity. Because Mother listed Father as a possible biological father of Child, DCS also alleged that Child was dependent as to Father on the grounds Father had failed to protect Child from Mother's substance abuse.

¶7 The juvenile court determined that Child was a temporary ward of the state on January 29, 2014; neither parent was present for the hearing. Then, in late February, Father was arrested in Arizona for two counts of Possession of Drug Paraphernalia, one count of Possession of Dangerous Drugs for Sale, and one count of Possession of Narcotic Drugs. Between late February and early March, while Father was in custody in the Mohave County jail on these charges, DCS asked Father to submit to a DNA test in order to establish paternity. However, upon his release, Father failed to contact DCS to set up the testing.[3]

¶8 It was not until Father received a child support order at the end of March that he finally agreed to submit to a DNA test. Father provided DCS with a DNA sample in April. In May, the results established that Father was Child's biological father. Father began sporadically exercising his visitation rights with Child in June 2014.

¶9 On September 3, 2014, DCS filed a petition for severance as to both Mother and Father. A severance trial was held on January 26, 2015 and February 17, 2015.

¶10 On April 6, 2015, the trial court signed an order terminating the parental rights of Mother and Father. Mother's rights were terminated on the grounds of abandonment (A.R.S. § 8-533(B)(1)), neglect (A.R.S. § 8-533(B)(2)), substance abuse (A.R.S. § 8-533(B)(3)), and six months' time in care (A.R.S. § 8-533(B)(8(b)). The juvenile court terminated Father's rights solely on the grounds of time in care, dismissing all the remaining grounds for severance. Both Mother and Father timely appealed.

---

[3] At one point during the dependency, Father advised the DCS investigator that DCS would have to catch him in California to obtain a DNA test.

## DISCUSSION

¶11 Mother and Father argue that the State did not establish grounds for termination by clear and convincing evidence. We disagree.

¶12 As the trier of fact in a termination proceeding, the juvenile court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and make appropriate findings." *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 4 (App. 2002) quoting *In re Pima Cnty. Dependency Action No. 93511*, 154 Ariz. 543, 546 (App. 1987). "[W]e will accept the juvenile court's findings of fact unless no reasonable evidence supports those findings, and we will affirm a severance order unless it is clearly erroneous." *Id.* To terminate the parent-child relationship, the court's findings must be based on clear and convincing evidence. Arizona Revised Statutes ("A.R.S.") section 8–537(B) (2007); *Jesus M.*, 203 Ariz. at 280, ¶ 4.

## I.    Statutory Grounds for Severance: Six Months' Time in Care

¶13 Both parents' rights were terminated on the grounds of six months' time in care. A.R.S. § 8-533(B)(8)(b). Although Mother's parental rights were terminated on multiple grounds, if sufficient evidence supports termination on any one ground, we need not consider her challenge on any other grounds. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 251, ¶ 27 (2000).

¶14 A.R.S. § 8-533 (B)(8)(b) provides for termination of a parent's rights under the following circumstances:

> The child who is under three years of age has been in an out-of-home placement for a cumulative total period of six months or longer pursuant to court order and the parent has substantially neglected or willfully refused to remedy the circumstances that cause the child to be in an out-of-home placement, including refusal to participate in reunification services offered by the department.

¶15 Termination based on six months' time in care "focuses on the level of the parent's effort to cure the circumstances rather than the parent's success in actually doing so." *Marina P. v. Ariz. Dep't of Econ. Sec.*, 214 Ariz. 326, 329, ¶20 (App. 2007). Termination, however, "is not limited to those who have *completely* neglected or willfully refused to remedy such circumstances." *In re Maricopa Juv. Action No. JS-501568*, 177 Ariz. 571, 576 (App. 1994) (construing A.R.S. § 8–533(B)(6)(a), the predecessor to A.R.S. §

4

8-533(B)(8)(b)). Rather, parents are required to "make appreciable, good faith efforts to comply with remedial programs outlined by [DCS]" to remedy the circumstances that caused out-of-home placement. *Id.*, at 576.

¶16 Additionally, before a parent's rights can be terminated DCS must make "a diligent effort to provide appropriate reunification services." A.R.S. § 8-533(B)(8); *see Mary Ellen C. v. Ariz. Dept. of Econ. Sec.*, 193 Ariz. 185, 193, ¶ 12 (App. 1999). To satisfy this requirement, DCS must provide a parent "with the time and opportunity to participate in programs designed to help [him] become an effective parent." *In re Maricopa Cnty. Juv. Action No. JS–501904*, 180 Ariz. 348, 353 (App. 1994).

¶17 Mother and Father do not challenge the juvenile court's findings that Child was under three years of age or that he had been in an out-of-home placement for a cumulative total period of six months or longer pursuant to a court order. Mother also does not challenge the court's finding that DCS had made a diligent effort to provide appropriate reunification services.

## A. Mother

¶18 Mother argues there was insufficient evidence supporting the court's termination of her parental rights based on six months' time in care. Based on our review of the record, we conclude there is reasonable evidence to support the court's determination.

¶19 Child was removed from Mother's custody based on her substance abuse; as a result, Mother's reunification plan focused on her making efforts to remedy her substance abuse problem. However, Mother did not make a good faith effort to actively remedy this problem. Mother failed to complete an intake assessment with two separate substance abuse treatment providers. In addition, Mother did not actively participate in drug testing, despite being advised that failure to provide a drug test would be considered a positive drug test. Indeed, Mother only provided one drug test to DCS during Child's dependency.

¶20 Mother argues that she was hampered in her treatment efforts because, based on the advice of her DCS investigator, she spent several months in California trying to resolve her legal issues. However, Mother's argument does not address her lack of participation in her drug treatment services from the time she returned to Arizona in July 2014, until the severance trial in January 2015. Throughout this time period, Mother did not engage in substance abuse services nor did she participate in drug testing.

¶21    Accordingly, we conclude the record supports the juvenile court's severance of Mother's parental rights pursuant to A.R.S. § 8-533(B)(8)(b).

### B. Father

¶22    Father also challenges the sufficiency of the evidence supporting the juvenile court's termination order. Specifically, he contends (1) he was not provided a reasonable opportunity to participate in reunification services, (2) the services DCS directed him to complete were not appropriate given the circumstances of the case, and (3) he did substantially comply with the appropriate reunification services requested.

¶23    DCS' reunification plan required Father to show that he would protect Child from drug abusers. This plan was based on the fact Father knew Mother was using drugs during her pregnancy, and that Child was born exposed to drugs. Moreover, the importance of following this plan was certainly underscored when Father was arrested for selling drugs a few weeks after Child's birth. Thus, as part of Father's plan he was required to submit to drug testing and attend substance abuse counseling.

¶24    Father, however, substantially neglected to participate in the services made available by DCS. In September 2014, Father provided DCS with four urine samples, all of which tested negative for drugs. However, when DCS directed him to submit to an additional 30 days of drug testing, he refused to do so. DCS also directed Father to provide a hair follicle sample for testing; once again, he refused to provide a sample.

¶25    Additionally, based on several incidents involving Father's angry and aggressive behavior with DCS staff and providers, DCS determined that Father required additional services to assist him in becoming an effective parent. Specifically, during the dependency case, Father was very angry and aggressive with DCS employees and providers. For example, he raised his voice at a lab employee during a drug test, accused a DCS worker of stealing and kidnapping Child, and became highly agitated when a DCS worker came to his home for a scheduled visit. In addition, during Father's visits with Child, he was focused primarily on the actions of the DCS employees during visitation, rather than focusing on parenting his son. As a result, DCS directed Father to participate in specific, approved DCS courses for parenting, anger management, and domestic violence.

¶26    Father, did not participate in these services. Instead, he refused to attend the approved classes, and unilaterally chose to attend

non-approved online anger management and parenting courses. As the DCS case manager testified, the primary purpose of these courses was for the provider to observe Father during the classes and determine if he was making the necessary behavioral changes. This important treatment goal was not possible when Father attended online classes.

¶27　　　　Father contends that none of these classes were appropriate, given the fact the underlying dependency case did not involve domestic violence or any violence-related incidents. However, the scope of services included in a reunification plan includes those that are "appropriate" to make a parent a more effective parent. *See supra*, ¶ 15. Father's angry and aggressive behavior during the dependency provided a reasonable basis to include these services as part of his reunification plan.

¶28　　　　In sum, DCS made diligent efforts to provide Father with appropriate reunification services. DCS made substance abuse assessments, rehabilitative services, parenting classes, domestic violence classes and anger management classes available to Father. Father was also given an opportunity to show he was living a drug-free lifestyle, and therefore able to protect Child from drug abusers, through regular urinalysis testing. However, Father repeatedly refused to participate in the services provided by DCS. Accordingly, we conclude the record supports the juvenile court's determination.

## II.　Best Interests

¶29　　　　Mother and Father argue the juvenile court erred when it found termination to be in Child's best interest. We disagree.

¶30　　　　Before a court can terminate a person's parental rights, it must find by a preponderance of the evidence that severance is in the best interest of the child. A.R.S. § 8-533(B); *Kent K. v. Bobby M.*, 210 Ariz. 279, 284 ¶ 22 (2005). "[A] determination of the child's best interest must include a finding as to how the child will benefit from a severance *or* be harmed by the continuation of the relationship." *Maricopa Cnty. Juv. Action No. JS-500274*, 167 Ariz. 1, 5 (1990). The court may consider whether there is "an adoptive placement immediately available", "the existing placement is meeting the needs of the child", and "the [child is] adoptable". *Raymond F. v. Ariz. Dep't. of Econ. Sec.*, 224 Ariz. 373, 380, ¶ 30 (App. 2010) (internal citation omitted); *see Maricopa Cnty. Juv. Action No. JS-501904*, 180 Ariz. 348, 352, ¶ 3 (App. 1994).

¶31　　　　Here, the juvenile court found that Child would benefit from a severance because Mother and Father had not provided a safe and stable

home. In addition, the juvenile court determined that Child's current placement was meeting his needs, and that Child was adoptable. We find no error.

### III. Ineffective Assistance of Counsel

**¶32** Father contends his counsel was ineffective because he did not "follow through," or get a ruling from the court on his motions for (1) mediation, (2) home study, and (3) motion for return of custody of Child. Father also asserts counsel was ineffective because he failed to call certain witnesses at the severance hearing. As a result of these alleged failures, Father claims he was prejudiced.

**¶33** We will review an ineffective assistance of counsel claim on direct appeal only if "we may clearly determine from the record that the ineffective assistance claim is meritless." *State v. Whalen,* 192 Ariz. 103, 110 (App. 1997) (quoting *State v. Carver,* 160 Ariz. 167, 175 (1989)). To prevail on an ineffective assistance claim, a party must show that the representation fell below prevailing professional norms and that the party was prejudiced by the deficient representation. *John M. v. Ariz. Dep't of Econ. Sec.,* 217 Ariz. 320, 323, ¶ 8 (App. 2007). In establishing prejudice, a party must do more than simply speculate about the effect counsel's alleged deficiencies had on the outcome; rather, a party must show "that counsel's alleged errors were sufficient to 'undermine confidence in the outcome' of the severance proceeding and give rise to a reasonable probability that, but for counsel's errors, the result would have been different." *John M.,* 217 Ariz. at 325, ¶ 18 (internal citation omitted).[4]

**¶34** Father's ineffective assistance of counsel claim lacks merit. All of the subject motions were denied; therefore, Father suffered no prejudice due to counsel's failure to press the juvenile court into making a ruling or denied a fair trial. Specifically, the motion for return of custody was consolidated with the severance trial, and subsequently denied by the juvenile court. The court denied the mediation motion, concluding that mediation would not have been helpful in resolving the case. Finally, the court declined to grant the motion for a home study because Child was not

---

[4] Alternatively, if the ineffective assistance of counsel claim is seen as affecting the party's due process rights, we review the claim to see if the conduct of counsel was so inadequate that the party was denied a fair trial and the justice of the court's decision is called into serious question. *See In re Geist,* 310 Or. 176, 190-91 (1990). We conclude that the record also does not support relief under this standard.

living with either parent, and the supervised visits in the DCS offices had not been going very well.

¶35 Further, Father has not shown he suffered any prejudice due to counsel's failure to call certain witnesses or that the lack of those witnesses deprived Father of a fair trial. Father contends that the DCS case manager's supervisor "might" have been able to resolve certain disputes between Father and the case manager, such as when Father was given his reunification plan, and whether he was required to complete an additional 30 days of drug testing. However, both Father and the DCS case manager testified about these matters at the hearing, and both were subject to cross-examination by opposing counsel. Father's assertion that the DCS supervisor might have resolved this dispute is sheer speculation.

¶36 Similarly, Father's claim that admission of the outlines for his online parenting and anger management classes may have been helpful misses the point of these services. Father's unilateral decision to attend the online classes deprived the provider of the opportunity to observe the necessary behavioral changes during the classes.

¶37 In sum, none of these witnesses proffered testimony addressing the evidence that Father refused to participate in drug testing, anger management classes, parenting classes and domestic violence counseling as directed by DCS.

## IV. Findings of Fact and Conclusions of Law Objection

¶38 Father asserts that although the juvenile court dismissed the allegations against him concerning abandonment, neglect, and substance abuse, the court included findings that he had engaged in such conduct in its termination judgment. Our review of the record shows that Father is correct; the juvenile court did include findings and conclusions indicating Father's rights were severed on the grounds of abandonment, neglect, and drug abuse.

¶39 Father did not object to the juvenile court's findings of fact and conclusions of law; he raises this issue for the first time on appeal. "We generally do not consider objections raised for the first time on appeal." *Christy C. v. Ariz. Dep't of Econ. Sec.*, 214 Ariz. 445, 452, ¶ 21 (App. 2007) citing *Leigh v. Swartz*, 74 Ariz. 108, 114 (1952); *Jost v. Ross*, 82 Ariz. 245, 247 (1957). "However, this rule is procedural and not jurisdictional. The rule is for the benefit of the party against whom the defense is newly asserted on appeal and is intended to prevent surprise." *Stokes v. Stokes*, 143 Ariz. 590,

592 (App. 1984), citing *South Tucson v. Board of Supervisors*, 52 Ariz. 575 (1938); *Int'l Life Ins. Co. v. Sorteberg*, 70 Ariz. 92 (1950).

**¶40**        Here, the trial court made explicit findings that DCS failed to prove Father abandoned or neglected his child, or that he had a history of chronic drug abuse. However, language regarding those allegations is still present in the court's Findings of Fact and Conclusions of Law. We therefore remand this case and direct the juvenile court to strike those portions of the Findings of Fact and Conclusions of Law that are contrary to the court's findings on the record.

## CONCLUSION

**¶41**        For the reasons above, we affirm the juvenile court's termination of Mother and Father's parental rights to Child. However, we remand this case to the juvenile court to amend its findings of fact and conclusions of law as to Father regarding abandonment, neglect, and drug abuse.



Ruth A. Willingham · Clerk of the Court
F I L E D : ama